**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION**

**UNITED STATES OF AMERICA**

v.                                                                        **CASE NO: 5:18-cr-48-Oc-27PRL**

**JOVAN DEMETRIUS FREDERICKS**
_____

**REPORT & RECOMMENDATION**[1]

Defendant Jovan Demetrius Fredericks is charged by indictment with one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (Doc. 12). A jury trial is currently set for the January 2019 trial term. (Doc. 21). Fredericks has filed a motion to suppress evidence taken from his person, arguing that the evidence was obtained in violation of his Fourth Amendment right to be free from an unreasonable search and seizure. (Doc. 20).

**I.      BACKGROUND**[2]

On September 29, 2018, Ocala Police Department Officers Erik Cabrales and Reinaldo Rodriguez were patrolling the Parkside Apartments in Ocala, Florida. The officers, who patrolled the area regularly and were aware of recent reports of criminal activity including drug and firearm violations, saw Fredericks sitting in a recliner chair outside the closed door of an apartment. While the recliner was located close to one of the several multi-unit apartment buildings, it and the Defendant were in a grassy area — part of a common area — near sidewalks connecting the units.

---

[1] Specific written objections may be filed in accordance with 28 U.S.C. § 636(b)(1), and Rule 6.02, Local Rules, M.D. Fla., within fourteen (14) days after service of this report and recommendation. Failure to file timely objections shall bar the party from a *de novo* determination by a district judge and from attacking factual findings on appeal.

[2] The Court held a hearing on Fredericks's motion on December 18, 2018 during which Officers Cabrales and Rodriguez testified. In addition to the testimony, at the hearing, the Government presented the body-camera video of both officers taken during the incident, which the Court reviewed.

Fredericks was outside — not within any defined curtilage. Neither the recliner nor the grass it was on alter this fact.

As he walked past, Officer Cabrales, who didn't recognize Fredericks as a resident,[3] observed Fredericks partially concealing a brown, hand-rolled cigarette in the palm of his left hand. When Officer Cabrales asked Fredericks what he had in his hand, he did not respond. Officer Cabrales then repeated the question, and Fredericks showed the officers (Officer Rodriguez was there as well, as they were patrolling together) a lighter in his other hand but continued to conceal the cigarette. On the body-camera video, Officer Cabrales stated, "I see what you got in your hand man. I could see it from where I was at." He then calmly and politely asked Fredericks to stand up. As he stood up, Fredericks quickly turned his back to the officers and (it appears) tried to put the cigarette in his back pocket (or at least move his hand and arm towards his back area), but Officer Cabrales grabbed his arm to prevent him from hiding the cigarette (or otherwise reaching towards his back), while Officer Rodriquez quickly removed the cigarette from Fredericks's hand.

As Officer Cabrales grabbed Fredericks's arm to prevent him from hiding the cigarette (or otherwise reaching towards his back), he testified that he felt a bulge on Fredericks's right hip, which he astutely and correctly suspected was a firearm. On the video, Officer Cabrales can be heard immediately (and still calmly) saying to Officer Rodriguez: "He's got a gun on him." The officers placed Fredericks in handcuffs before removing the concealed firearm (a handgun with a large extended magazine) from Fredericks's waist.

The officers then walked Fredericks back to their police cruiser. On the walk back, Fredericks (while cuffed) reached towards his back pocket and the officers, checking on what he

---

[3] While Defense counsel showed that the officers didn't know whether other individuals in the videos were residents, both officers clearly stated that they hadn't seen Defendant at the complex before despite dozens of patrols by them, and thus they suspected he wasn't a resident. He wasn't. The management at the complex had authorized the police to trespass non-residents and this was part of their regular patrols.

2

was reaching for, then found a zipped bag containing narcotics that Fredericks was concealing. The cigarette in Fredericks's hand was tested later and revealed to be MDMA, commonly known as ecstasy. The other items in the zipped bag were an array of narcotics and Fredericks was a felon, prohibited from possessing a firearm.

## II. LEGAL STANDARD

An officer may, consistent with the Fourth Amendment, "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). The "reasonable suspicion" standard is less demanding than the "probable cause" standard: it requires the officer to articulate "a minimal level of objective justification for making the stop" that is more than "an inchoate and unparticularized suspicion or 'hunch' of criminal activity." *Id.* at 124 (quoting *Terry*, 392 U.S. at 27). The standard is an objective one, based on the totality of the circumstances. *U.S. v. Acosta*, 363 F.3d 1141, 1145 (11th Cir. 2004). And the Court views the circumstances in light of the officer's special training and experience. *U.S. v. Smith*, 201 F. 3d 1317, 1323 (11th Cir. 2000). Notably, reasonable suspicion does not require that the observed behavior is actually unlawful and can be "formed by observing exclusively legal activity." *Acosta*, 363 F. 3d at 1145.

A warrantless arrest, as distinguished from an investigatory stop, is permitted where officers have probable cause. *U.S. v. Goddard*, 312 F.3d 1360, 1362 (11th Cir. 2002). The difference between an investigatory stop and an arrest depends not on any single factor or test but rather on the "degree of intrusion, considering all of the circumstances." *U.S. v. Blackman*, 66 F.3d 1572, 1576 (11th Cir. 1995). In distinguishing the two, the Eleventh Circuit has focused on "the public interest served by the seizure, the nature and scope of the intrusion, and the objective facts

relied upon by the officers." *Id.* The fact that officers handcuff a person or even draw their weapons does not necessarily transform an investigatory stop into an arrest. *Id.*

## III. DISCUSSION

Fredericks does not contend that he was a resident, that he didn't obscure or conceal the cigarette, that the cigarette was lawful, or that he could carry a firearm, concealed or otherwise. Rather, Fredericks argues that (1) the Officers here lacked reasonable suspicion regarding the initial investigatory stop, and (2) that even if the Officers had reasonable suspicion for an investigatory stop, the initial investigatory stop expanded into an arrest, for which the Officers lacked probable cause. Both arguments are unavailing.

It is well-established that the officers' actions in approaching Fredericks and asking him questions do not "implicate the Fourth Amendment at all." *U.S. v. Lewis*, 674 F.3d 1298, 1303 (11th Cir. 2012). "There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets." *Id.* (quoting *U.S. v. Jordan*, 635 F.3d 1181, 1186 (11th Cir. 2011)). The Fourth Amendment was only implicated when Officer Cabrales detained Fredericks to conduct a further investigation—that is, when a reasonable person would no longer feel free to "decline the officers' requests or otherwise terminate the encounter." *U.S. v. Drayton*, 536 U.S. 194, 202 (2002). At the earliest, an investigatory stop arguably began when the Officers asked Fredericks to stand.

The Officers testified that leading up to asking Fredericks to stand, they were aware that the apartment complex was a high-crime area with a number of recent incidents involving firearms, gambling, and drug distribution. They were also aware, from their frequent patrols of the area, that the specific building outside of which Fredericks was sitting was known as a focus of criminal activity. This is not in dispute.

4

The officers also knew, from their training and experience, that the hand-rolled brown cigarette Fredericks was holding (indeed that they saw him holding in his cupped hand) was likely to contain an illegal substance.[4] *Cf. U.S. v. Hunter*, 373 F. App'x 973, 976 (11th Cir. 2010) (finding reasonable suspicion to detain defendant where officers smelled marijuana and saw defendant holding what they believed to be a marijuana cigarette). What's more, when the officers asked Fredericks to disclose the cigarette in his hand, rather than complying he attempted to mislead the officers by hiding or further concealing the cigarette and showing them a lighter that was in his other hand.

This is not a case where an individual is merely standing on a street smoking a commercial cigarette, as implied. Instead, the Defendant, who the officers hadn't seen in the complex before, is indisputably observed sitting in a recliner in a common area of a high crime apartment complex holding a hand-rolled cigarette that he attempted to conceal from the officers and who was then evasive when lawfully asked about it, all of which is objective indicia that criminal activity was afoot. *See U.S. v. Hunter*, 291 F.3d 1302, 1306 (11th Cir. 2002) (finding reasonable suspicion where defendant was in a high-crime area, near illegal gambling, walked away when the police approach, and had a bulge in his waist); *see also U.S. v. Brown*, 621 F.3d 48, 56 (1st Cir. 2010) (finding reasonable suspicion where officers observed defendant smoking a small cigar in the distinctive way marijuana is smoked); *U.S. v. Coates*, 457 F. Supp. 2d 563, 567–68 (W.D. Penn. 2006) (finding reasonable suspicion to stop based on appearance of cigar and manner of smoking

---

[4] Officer Rodriguez testified that he had previously encountered at least five individuals using hand-rolled cigarettes to consumer illegal drugs, while Officer Cabrales likewise testified that he had encountered at least twelve hand-rolled cigarettes similar to the one Fredericks possessed, including at the Parkside Apartments, and had not yet encountered an individual using such a cigarette for a lawful purpose, even if a lawful purpose is possible.

5

it). They certainly had enough information to warrant asking him to stand. They had enough to investigate.

The fact that Fredericks's actions could have been perfectly legal—that is, that the cigarette might have contained only a legal substance such as tobacco—is not dispositive, as the reasonable-suspicion standard does not require officers to "rule out the possibility of innocent conduct." *U.S. v. Arvizu*, 534 U.S. 266, 277 (2002); *see also Wardlow¸* 528 U.S. at 677 (holding that where conduct is not clearly illegal, *Terry* allows officers to "detain the individuals to resolve the ambiguity"). Nor, as noted, is that possibility viewed in a vacuum.

Fredericks next argues that the officers' actions in detaining him and placing him in handcuffs exceeded the scope of an investigatory stop, arguing that the officers asked him to "stand up and immediately [began] to place him in handcuffs." (Doc. 20, p. 5). This simplistic description of events isn't consistent with the evidence. And, it is well-established that merely placing a suspect in handcuffs does not transform an investigatory stop into an arrest. *See Blackman*, 66 F.3d at 1576. "Once an officer has legitimately stopped an individual, the officer can frisk the individual so long as 'a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" *Hunter*, 291 F. 3d at 1306 (quoting *Terry*, 392 U.S. at 27).

Fredericks was significantly larger than both officers—Officer Cabrales estimated Fredericks stood 6' 4" and weighed around three hundred pounds while the two officers stood 5' 10" and 5' 4" respectively and weighed much less. In addition, and importantly, when Officer Cabrales grabbed Fredericks's hand to prevent him from putting the hand-rolled cigarette into his back pocket or otherwise reach towards his back, he incidentally made contact with the Defendant — indeed, contact that appears to have been made *because* Fredericks reached or moved his hand

6

towards his back — and Officer Cabrales immediately felt the weapon in Fredericks's waist. *See Minnesota v. Dickerson*, 508 U.S. 366, 375–76 (1993) (recognizing a "plain touch" exception for contraband discovered while patting down a suspect). Upon feeling the firearm, again incidental to preventing Fredericks from moving his arm towards his back (where the firearm happened to be), Officer Cabrales verbally noted the firearm, handcuffed Fredericks, removed the gun, and walked him to his patrol car to continue the investigation and ultimately arrest him.[5] The entire encounter, from the initial request that Fredericks stand up to Officer Cabrales removing the gun from Fredericks's waist took less than ninety seconds.

Fredericks wasn't handcuffed for initially concealing the cigarette (though he could have been given the circumstances — the need to investigate and for officer safety), he was handcuffed because he was armed, a fact that became apparent when he motioned towards his back and Officer Cabrales felt the gun. His cuffing was lawful to pursue the next stage of the investigation, as well as for officer safety, and it was lawful incidental to his arrest for having a concealed weapon.

Indeed, Officer Cabrales testified that at the time he felt the firearm, which again was detected during a lawful investigatory stop, he then placed Fredericks in handcuffs and arrested him for possessing a concealed weapon. Because the contact was lawful, there is no basis to suppress the evidence found at this point — the hand rolled cigarette and the firearm with the fully loaded extended magazine. Further, the evidence then located in his pockets during a further search of his person, including the bag of narcotics obtained when Fredericks reached for his pocket during his short walk to the patrol car, was lawfully obtained. Whether the officers were engaged in ensuring he didn't have any further weapons as part of their investigation (noting that they had

---

[5] At no point did Fredericks give any indication that he lawfully possessed the gun or otherwise had a concealed weapon permit.

just found one on him)[6] or incidental to an arrest based on the firearm (as Officer Cabrales stated),[7] their conduct was entirely lawful and, again, there is no basis to suppress the evidence found at this point (or any other point).

Under the totality of the circumstances, the motion to suppress is due to be denied.

## IV. RECOMMENDATION

Accordingly, it is **RECOMMENDED** that Defendant's motion to suppress (Doc. 20) be **denied.**

**Recommended** in Ocala, Florida, on December 18, 2018.

PHILIP R. LAMMENS
United States Magistrate Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties

---

[6] *United States v. White*, 593 F.3d 1199, 1202–03 (11th Cir. 2010) (explaining that officers may conduct a pat-down search as part of a lawful investigatory stop when the officer "has reason to believe that his own safety or the safety of others is at risk").

[7] *United States v. Montague*, 437 F. App'x 833, 835–36 (11th Cir. 2011) (holding that officers did not need to determine whether the defendant had a permit for a concealed weapon before conducting a *Terry* stop and noting that a permit was an affirmative defense not an element of the crime); *see also United States v. Spann*, No. 15-20070, 2015 WL 1969111, at *5 (S.D. Fla. May 1, 2015) (holding that "the determination of whether there is probable cause to believe a defendant committed the offense of openly carrying a firearm is governed by the well established totality of the circumstances standard" and finding that "this standard necessarily includes consideration of whether it appears that an affirmative defense exists, but does not require express questioning by the police of the existence of such a defense"); *State v. Burgos*, 994 So. 2d 1212, 1214 (Fla. Dist. Ct. App. 2008) ("Although some citizens do have the right to carry concealed firearms lawfully, the vast majority do not. Reasonable suspicion and probable cause are based on probabilities, not absolute certainty. It is not necessary that police allow an individual to continue in possession of a firearm while they confirm the suspected crime to an absolute certainty.") (citing *State v. Jones*, 417 So. 2d 788, 793 (Fla. 5th DCA 1982).